THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS, INDIANA

| | | |
|---|---|---|
| ESTATE OF ANTHONY J. SUSKOVICH, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Cause No.1:06-cv-0425-SEB-JMS |
| | ) | |
| ANTHEM HEALTH PLANS OF | ) | |
| VIRGINIA, INC., ANTHEM INSURANCE | ) | |
| COMPANIES, INC., ANTHEM LIFE | ) | |
| INSURANCE COMPANY, HEALTH | ) | |
| MANAGEMENT SYSTEMS, INC., | ) | |
| ONENATION BENEFIT | ) | |
| ADMINISTRATORS, INC., | ) | |
| THE WELLPOINT COMPANIES, INC., | ) | |
| WELLPOINT, INC., and its Pension and | ) | |
| Welfare Benefits Plans, and the Fiduciaries | ) | |
| and Administrators of the Plans, | ) | |
| and TRASYS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Anthony Suskovich did not like filing tax returns or paying income taxes.
As a result of that aversion, when he died at a relatively young age on January
1, 2006, he left his estate, the Plaintiff in this action, with a large debt of
unpaid taxes, fines and penalties.  The estate is seeking indemnity for much of
that debt from the Defendants, which it claims were Suskovich's employers.  In
addition to the indemnity claim, Plaintiff also seeks damages from Defendants
for their alleged failure to live up to their obligations as Suskovich's employer.
According to his estate, beginning in 1996 Suskovich was employed by various

divisions of Wellpoint, Inc. and/or Anthem Insurance Companies, Inc. (hereinafter "Wellpoint/Anthem Defendants")[1] and later in his career, at the time of his death, employed jointly by the Wellpoint/Anthem Defendants and Trasys, Inc., the remaining Defendant.  Despite the fact that in each of these relationships, Suskovich and the Defendants referred to his role as being that of an independent contractor, Plaintiff claims that under Indiana law Suskovich was, in fact, an employee and, accordingly, entitled under federal law to the benefits that Defendants provided their employees.  In addition to the receipt of insurance-related benefits and overtime pay, the estate claims that Suskovich should also have received the benefit of having his employer withhold and pay to the government portions of his state and federal income and employment related taxes, hence the indemnity claim.

Plaintiff's claims hinge on a determination that Suskovich was an employee, as opposed to an independent contractor.  Because the evidence is overwhelming that Suskovich was an independent contractor, we side with the Defendants here and grant their summary judgment motions.

_____

[1] Wellpoint, Inc. and Anthem Insurance Companies, Inc. were each rapidly growing by way of  acquisitions, mergers and the like during the relevant time period, with each eventually becoming part of a related family of companies which provide health care coverage across the country.  For the sake of simplicity, and because the specific corporate name of the family entity retaining Suskovich changed from time to time, in this entry the court refers to all of these related entity Defendants as the "Wellpoint/Anthem Defendants," unless there is a particular reason to distinguish between them.

## *Summary Judgment Standard*

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Our ruling on a motion for summary judgment is akin to that of a directed verdict. The essential question for a court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

When, as here, both sides to a controversy seek a summary ruling in their favor, the court must still examine each motion while construing the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255. The party bearing the burden of proof on an issue at trial and opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.1999). The moving party need not positively disprove the opponent's case; rather, it may

prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### *Background*

In 1995, Suskovich, who had been working for several years in the Indianapolis area as a computer analyst and consultant, established an Indiana  corporation and named it Indy Imaging, Inc.. He and his wife were the sole officers of the corporation.  Shortly thereafter, Suskovich began using the corporate name on his resume, utilizing "Indy Imaging, Inc. d/b/a Anthony J. Suskovich" as a description when setting out his work experience on his resume.  He sought work from the Wellpoint/Anthem Defendants in 1996.

The Wellpoint/Anthem Defendants are related companies and part of a large family of companies that provide group and individual health care programs to people all over the United States.  They are headquartered in Indianapolis, Indiana.  In addition to the many persons, known as associates, employed by the Wellpoint/Anthem Defendants, the various divisions or related entities also retain independent contractors to perform specialized work for specific periods of time.  In 1996, the Wellpoint/Anthem Defendants retained Suskovich and a number of other information technology  professionals to work on the Interplan Teleprocessing Services National IT Team.  Suskovich was retained for his mainframe programming skills.  Like many growing companies,

the Wellpoint/Anthem Defendants had large IT integration projects for which they retained professionals with specific skills on a  temporary basis.

There was no written contract between Suskovich and the Wellpoint/Anthem Defendants during the first few years of his work on the national team, or at least none made of record here.  We know that when he signed computer access authorization documents, he did so as a contractor, rather than an employee, and that he regularly invoiced defendants for his time, receiving approximately $60 per hour for his time.  He also kept up to date resumes which referenced his work for the Wellpoint/Anthem Defendants as an "independent computer consultant."  Though he was offered the opportunity on several occasions, Suskovich refused to become a full-time associate, the designation given employees by the Wellpoint/Anthem Defendants.   He generally worked at least 40 hours per week, invoicing for those hours on a weekly basis, but receiving the same hourly rate regardless of the number of hours worked.  Suskovich's earnings grossed twice as much, or more, than those who did similar work as full time associates of the Wellpoint/AnthemDefendants.  He received no additional benefits.

Bruce Jeschke and Tom Eberhard were two IT contemporaries and friends of Suskovich who were also "outside contractors" with the Wellpoint/Anthem Defendants at the time when Suskovich started work there. They both eventually accepted offers of employment with the Wellpoint/Anthem

Defendants and also both rose to an administrative or managerial level where they supervised projects that Suskovich worked on and attempted to entice him to join the ranks of the permanently employed with offers of a full benefit and retirement package. They were never successful in their recruitment efforts and often were left to secure budgetary approval from the company to keep Suskovich's skill set in place on any projects they were overseeing.

Up until the year 2000, the Wellpoint/Anthem Defendants retained outside IT contractors through numerous third-party personnel companies and individually owned corporate entities. They dealt with as many as 127 separate third-party vendors when obtaining the assistance of outside professionals until efforts to reduce that number were successful. Generally, the Wellpoint/Anthem Defendants would agree to six-to-twelve-month contract terms for the outside individuals they retained, at which point they would renew the agreements if further assistance were needed and the Wellpoint/Anthem manager was able to obtain budgetary approval. The forms that were completed in order to request such budgetary approval always referred to Suskovich as a "contractor."

At the end of 1999, when the term of an agreement with Suskovich expired, he was let go, only to be retained again shortly thereafter when additional funds were budgeted for the project. It was at this time that Wellpoint/Anthem was focusing on working through fewer third-party vendors

-6-

to obtain outside assistance for IT and other projects.  The total number of outside vendors was reduced to 26 preferred vendors, which included Trasys, Inc. ("Traysis"), as an approved vendor for IT assistance.  Since Suskovich was among those outside contractors not making the new preferred list, he was only able to continue working on Wellpoint/Anthem projects through an arrangement he established with Trasys.  At Wellpoint/Anthem, his friend and former contractor colleague, Bruce Jeschke, requested the necessary budgetary allotment to secure Suskovich's services through Trasys through mid-September of 2000.

Suskovich was able to keep this arrangement in tact without a formal contract with Trasys until Febraury 9, 2001, at which time he signed an "Independent Contractor Agreement." Despite its title, this agreement contained conflicting terms and utilized terminology which in certain respects arguably suggested an employment relationship, while other provisions clearly distinguished the relationship as something other than an employment relationship.   For example,  the agreement referred to the "wages" to be paid Suskovich as well as other "consideration" for his "employment," but the agreement also contained references to a "contract" which extended for a "temporary period."  There also was language in the agreement calling for Suskovich to indemnify Trasys and a confidentiality requirement in the document, obligating Suskovich not to discuss the amount of his compensation

-7-

with Wellpoint/Anthem employees or other contractors.  Under the February,
2001, document, Suskovich's compensation was set at $62 per hour, based on
his weekly time sheets which he was responsible for maintaining and for which
he was obligated to secure the approval of a Wellpoint/Anthem supervisor.
Beyond his compensation, Suskovich received no other benefits from Trasys.

Pursuant to their agreement with Trasys, Wellpoint/Anthem submitted
periodic "schedules" to describe the work to be performed by the Trasys
subcontractors, including Suskovich.  Those schedules referenced the skills
and work product required of the subcontractor, the name of the project each
was working on and the hourly rate paid to Trasys to cover that person's work.
In Suskovich's case, the amount paid to Trasys by Wellpoint/Anthem was
approximately six dollars more per hour than the amount Suskovich was paid
by Trasys.[2]  The skills requested or expected by Wellpoint/Anthem were rated
on a scale between one and five, with five being the highest level of skill
required and one, the lowest.  None of the schedules for Suskovich listed
required skills that were lower than level four and most of the skills required in
those schedules were at level five.  Those schedules provide us with the most

_____

[2]Six dollars per hour was a lot less than the typical profit margin Trasys built into the
hourly fees it received from Wellpoint/Anthem for the IT personnel it provided.  Recognizing
that it incurred no expense associated with finding and providing Suskovich, who was already
working on projects at Wellpoint/Anthem when the preferred vendor program was initiated,
Trasys agreed to charge the reduced hourly fee as an accommodation to Wellpoint/Anthem.

helpful detail regarding Suskovich's work on various projects with Wellpoint/Anthem from early 2000 through mid 2005.

While working through Trasys, no one from Trasys provided direct supervision to Suskovich with regard to his work. He answered to Wellpoint/Anthem employees who were in charge of the projects to which he was assigned and, at times, he worked on more than one project within more than one Wellpoint/Anthem division or under more than one supervisor. He worked in an "office cubicle" with a computer, both of which were provided by the Wellpoint/Anthem Defendants. While there is some evidence in the record suggesting that he received "comp time" from Wellpoint, there is also evidence establishing that he was never paid by Trasys or Wellpoint/Anthem during time periods when he was on vacation. On occasion, Suskovich worked from home, but according to nearly all witnesses, as with the full-time associates on the project, Suskovich was also expected to answer to Wellpoint/Anthem project supervisors on a day-to-day basis. Suskovich submitted his own weekly invoices and the Trasys time sheets to the Wellpoint/Anthem project supervisor and, after approval of the hours worked and transmittal of the information to Trasys, Trasys issued checks to Suskovich covering the amountof his invoices. Later, Trasys invoiced Wellpoint/Anthem for Suskovich's time with the additional six dollars or so per hour administrative fee.

At one point in 2005, Suskovich successfully negotiated some additional work from Anthem Health Plans of Virginia, a related company to Wellpoint/Anthem, but one which did not have a preferred provider program, allowing him to bypass Trasys in terms of that project.  Thus, he drafted an "Agreement For Consulting Service" and submitted it to Edward Wright, the person in charge of the work at Anthem Health Plans of Virginia.  That agreement, which was accepted with only minor changes, expressly provided that Suskovich was not an employee, but an independent contractor.  Accordingly, he was issued a separate IRS form 1099 from Anthem Health Plans of Virginia covering his earnings for that work.

In August of 2005, Wellpoint/Anthem advised Suskovich that they would not continue his services past the end of that year.  They did extend his contract through Trasys when it came due in mid-September, but only through December.  Around that same time, Suskovich was asked to train an existing Wellpoint/Anthem employee in the programming language which he was utilizing at the time, to permit a smooth transition.  The expense incurred in keeping Suskovich in order to benefit from his programming language skills and to have him transfer those skills to an existing employee was an issue which Wellpoint/Anthem raised in-house as early as November of 2004.  Suskovich's refusal to become a full-time Wellpoint/Anthem associate

-10-

apparently generated a cost escalation that the company was unwilling to sustain indefinitely.

As soon as he became aware that his days with Wellpoint/Anthem were limited, Suskovich began seeking other clients with whom he could consult. During this time, his efforts to train the in-house Wellpoint/Anthem employee and to attend project meetings did not meet expectations.  Thus, Wellpoint/Anthem complained to Trasys, warning that it might replace Suskovich with someone from another preferred vendor if his performance did not improve.  Patrick Foley, COO of Trasys, approached Suskovich to urge him to comply with the requests of Wellpoint/Anthem, and Foley thereafter assured Wellpoint/Anthem that Suskovich's conduct would improve - more specifically that he would respond in a timely fashion at meetings and allow an employee to shadow him to observe his work and his methods.  However, Foley also advised Wellpoint/Anthem that a back-up plan should be devised in case Suskovich sought an early release from his existing commitment.  Suskovich continued to search for other clients and engaged in negotiations with various companies.   He also approached his former colleague, Eberhard, about any needs Eberhard might have in any other Wellpoint/Anthem division.  Eberhard had no work for an IT contractor at the time, but did discuss the possibility of full-time employment.  According to Eberhard, Suskovich's salary demand was

higher than the authorization set for a permanent position, but, before more discussions could ensue, Suskovich contracted pneumonia and suddenly died.

As was the case with Wellpoint/Anthem, including Anthem Health Plans of Virginia, Trasys issued Suskovich an IRS form 1099 for each year he performed under their contract. His compensation was listed either as "nonemployee compensation" or "other income" on the form for each year and ranged in amounts from $120,960.00 to $202,560.00. Despite his receipt of these forms, Suskovich did not always file tax returns and the IRS began an investigation of him in early 2004, after noting that he had failed to file for several years. In response to the investigation, Suskovich did file delinquent federal income tax returns for years 1999 through 2002 and later filed returns for 2003 and 2004. On those returns, he represented that he was a self-employed computer consultant and claimed his income was derived from his sole proprietorship consulting business, against which he claimed substantial business expense deductions.

Beginning in December of 2004, pursuant to a notice of levy to Trasys, the IRS collected $4,345 a month from Suskovich's compensation. After negotiations between the IRS and Suskovich, the amount of the monthly levy was dropped in February 2005, but was due to increase again in January of 2006. Suskovich died on January1, 2006. As of February 2007, the IRS claims his wife and estate still owe federal income taxes and penalties of

slightly less than $100,000.  Their tax debt to the state of Indiana is estimated to be between $33,000 and $34,000.  His surviving spouse, who also serves as the personal representative of his estate, Kathy Suskovich, sought innocent spouse relief from the federal government, but, following an investigation, the IRS denied that relief.

The estate filed this lawsuit in March of 2006,  seeking a declaratory judgment that Suskovich was first an employee of Wellpoint/Anthem  and later was jointly employed by Trasys and Wellpoint/Anthem.  The suit seeks to establish an entitlement to compensation for overtime that allegedly should have been paid to Suskovich under the Fair Labor Standards Act (FLSA) and non-wage benefits due under the Employee Retirement Income Security Act (ERISA).   Finally, Plaintiff seeks common law indemnity for any asserted tax liabilities.

## Discussion

Every claim made in this lawsuit turns on the single issue of whether any Defendant was Suskovich's "employer," either at common law or as determined under applicable statutes.  The analysis to be applied to all these claims arises under the common law, in conjunction with the Restatement (Second) of Agency § 220(2) (1958), to which the courts have traditionally turned for a helpful, yet nonexhaustive list of factors to be considered when

distinguishing between a servant or employee and an independent contractor. *Nationwide Mut. Ins. Co. V. Darden*, 503 U.S. 318, 323-24 (1992); *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 709 (7th Cir. 2002); *Moberly v. Day*, 757 N.E.2d 1007, 1009-10 (Ind. 2001).  No shorthand formula exists for determining the precise method by which a relationship is to be defined; wetherefore examine the specific peculiarities of each individual circumstances. *Darden*, 503 U.S. at 324.

Common law provided Suskovich as well as the Defendants with the freedom to define their own relationship through contract.  *See E.E.O.C. v. North Knox School Corp.*, 154 F.3d 744, 748 (7th Cir. 1998).  So long as any agreement  between Suskovich and the Defendants did not ignore or run afoul of any statutory mandate, such an agreement is to be honored by the court. With respect to Anthem Health Plans of Virginia and Trasys, both entered into written agreements with Suskovich which defined their relationship.  With respect to the remaining Wellpoint/Anthem Defendants, the agreement was not reduced to writing, so the intent of the parties must be divined from factors other than a particular document.

Plaintiff argues that Suskovich could not contractually waive employee status, citing *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662 (5th Cir. 1983), an FLSA case in which welders who signed independent contractor agreements successfully pursued overtime wage compensation despite the fact that they

had signed independent contractor agreements.  The court in *Robicheaux* opined that the welders "economic dependence" on the company for which they performed work  far outweighed any other  relevant factors in assessing the the nature of their relationship.  *Id*. at 667.  The facts in the *Robicheaux* case  are sufficiently unique to limit its persuasiveness here.  We do not regard the Fifth Circuit's analytical reliance on "economic dependence" as controlling.

Further, the appellate decisions from this circuit which examine whether an employment relationship exists seem to place primary emphasis on the intent of the parties as indicating the true nature of the relationship.  *See Aberman v. J. Abouchar & Sons, Inc.,* 160 F.3d 1148 (7th Cir. 1998); *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 944-45 (7th Cir 1984).  In fact, recognizing that the parties can not fully control the legal nature of their relationship by assigning their own titles or definitions to it, the Seventh Circuit has held: "[W]here, as here, the parties define their relationship as that of an independent contractor-principal, and the facts of their relationship support that conclusion, courts will not interfere with the intent of the parties." *Stone*, 741 F.2d at 945.  We find that approach to be a sound one in resolving the issues before us.  Clearly, the parties can not enter into a written agreement defining their relationship for the specific purpose of avoiding a federal mandate, but that did not occur here.  Indeed, there are exceptions to FLSA overtime coverage (the issue in *Robicheaux* and part of what is being sought

here as well), that would likely exempt Suskovich, even if we were to conclude that he was an employee.  *See* 29 C.F.R. § 541.401(b) (computer programmer exception) and § 541.601 (highly compensated employee exception).

Plaintiff contends that, if this court were to apply the ten-factor test adopted by the Indiana Supreme Court in *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001) and referred to favorably by the United States Supreme Court in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992), the conclusion we would necessarily reach is that Suskovich was an employee first of Wellpoint/Anthem and later jointly of Trasys and Wellpoint/Anthem.  We have conducted that analysis, but came to the contrary conclusion.  Nearly all of those ten factors point to a contractor-principal relationship between Suskovich and Wellpoint/Anthem; certainly the most significant of those factors point to that conclusion.

Following the lead of the United States Supreme Court in *Darden*, the Indiana Supreme Court drew from the Restatement (Second) of Agency § 220(2) to undertake its own ten-factor analysis in *Moberly*.[3]  *Id.* at 1010.  Those factors are:

_____

[3]Since the date of the *Moberly* decision, as well as the Supreme Court's reliance on § 220(2) of the Restatement (Second) in *Darden*, the American Law Institute has promulgated, adopted and published a Restatement (Third) of Agency (2006).  The new Restatement does not contain a section setting forth the factors differentiating a servant and an independent contractor.

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Id.*

Starting with an exhaustion of the "control" factor, it is clear that Trasys had little to no control over the details of Suskovich's work.  Trasys received Suskovich's "timesheets" after their approval by the Wellpoint/Anthem project supervisor.  Further, the chief operating officer of Trasys was enlisted to persuade, rather than to direct, Suskovich to comply with the requests of the Wellpoint/Anthem project supervisors.  These are clear indications that

between Suskovich and Wellpoint/Anthem, Trasys acted simply as an administrative middle-man.  On the other hand, Wellpoint/Anthem may well have exerted some control over the hours and location of the work performed by Suskovich and may have set the substantive standards for that work.  Even so, it can not be said that Wellpoint/Anthem had control over the "details" of how Suskovich's work was to be performed on a day-by-day, hour-by-hour basis.  *Cf. Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438-39 (7th Cir. 1996)(designation of starting time, hours of availability, rate setting and call in requirements not control over details of job performance).  In fact, the record is very clear that Wellpoint/Anthem's inability to develop, either through internal training or employee acquisition, the type of programming skills possessed by Suskovich made him the costly indispensable hire that he was.  With no employee possessing computer programming language skills comparable to Suskovich and thus capable of supervising his work, Wellpoint/Anthem was even less able to control the details of Suskovich's performance.  Clearly, based on an analysis of the extent of control over his work, Suskovich must be deemed a contractor, rather than an employee.

Suskovich himself represented at various times to the government, primarily through his sworn tax filings, that he was a self-employed computer consultant.  For example, he claimed tax deductions for his own business expenses.  His resume described his various design skills and also referenced

-18-

his corporate entity, Indy Imaging, Inc., in detailing his work experience from 1994 forward.  At times, he worked simultaneously for two separate Wellpoint/Anthem divisions or entities, and sought work from other companies as well at the same time.  If he had been an employee of  Wellpoint/Anthem during that period, he would have been prohibited from  "serving a second master."  In fact, Suskovich was but one of many IT professionals who contracted with Wellpoint/Anthem.  His records indicate that he sought work from other companies in the local area who also used contractors to perform speciality IT services.   These facts clearly evidence that Suskovich possessed unique skills which allowed him to engage in work that often is performed through outside contracts.  This conclusion satisfies the second, third and fourth of the ten factors listed in *Moberly*.

Further, Trasys did not supply the instrumentalities used by Suskovich or the place where his work was to be performed.  Wellpoint/Anthem did provide him with a computer and office space, but did so based on its need to maintain both confidentiality and system safety.  Moreover, given the frequency of on-site technology consulting in today's economy whereby a  business is able to take advantage of a broader range of IT skills than it might if it had to hire employees to cover each need, we attach little significance to the provision of computer and office space to any person - employee or contractor - who has been engaged to apply these skills.

The sixth factor on the list of ten relates to the length of time the person spends working for the principal.  Plaintiff argues that, in this case, the length of time Suskovich was employed by Wellpoint/Anthem was nearly ten years, five of which were also with Trasys.  However, the evidence is overwhelming and undisputed that Suskovich worked on projects for six to twelve month periods, sometimes less, but always without any guarantee that he would be retained past any particular time period.  Thus, he seemed always to be on the look-out for a next project.  As previously noted, he worked with various Wellpoint/Anthem divisions, sometimes more than one at the same time.  He also worked for other companies during the ten years he was connected with Wellpoint/Anthem, and, though not lengthy, there were certain times when his existing contracts would expire, leaving him without work to do for Wellpoint/Anthem.  Finally, the contract between Trasys and Suskovich expressly provided that the length of his "assignment" was contingent upon the client's will and that their relationship could be terminated at any time.

Suskovich was never on the Wellpoint/Anthem or Trasys payroll.  He was at all times required to invoice for his hours and his pay was based on those invoices.  He was in every instance issued an IRS  form 1099, as opposed to a W-2, and no records exist to indicate that he took issue with Trasys, Wellpoint/Anthem or the government regarding their designation of his compensation as non-wage.  In fact, when he filed tax returns, he listed his

income as business income derived from his sole proprietorship.  As other courts have held in similar circumstances, we find here that the representations he made under oath on his tax returns are presumptively correct, in attempting to determine the intent of all the parties concerning their relationship.  *See Weary v. Cochran*, 377 F.3d 522, 527-28 (6th Cir. 2004); *Aberman v. J. Abouchar & Sons, Inc.,* 160 F.3d 1148, 1151 (7th Cir. 1998); *Broadway Raiology Services, Inc. v. Tricou,* 725 N.E.2d 435, 438 (Ind. App. 2000).  We are especially skeptical concerning the validity of this claim, given that, in order to prevail on it, the estate of Suskovich must adopt a position contrary to the sworn expression of the decedent.

The next of the ten enumerated factors we address here is whether the work performed by Suskovich was part of the regular business of Trasys or Wellpoint/Anthem.  With respect to the latter, there is no question that Wellpoint/Anthem was, and remains, in the business of providing health insurance coverage, not computer programming or system design.  Wellpoint/Anthem utilized computer programs and systems as tools for regulating and providing health coverage to its insureds.  The projects that Suskovich was involved in related to the mechanics of those systems, not the end product and, in any event, each project was a discrete undertaking of limited duration, rather than part of the ongoing, daily data processing function at  Wellpoint/Anthem.

Trasys's business was to supply technology personnel to other companies, and Suskovich was one of its stable of experts farmed out to clients. Though he had some of the markings of an employee, the evidence of record makes clear that Trasys's role was merely that of a middleman here, an arrangement entered into after the preferred vendor program made it impossible for Suskovich to continue to contract directly with Wellpoint/Anthem. Thus, Suskovich's deployment did not conform even to the business model employed by Trasys; for example, it did not generate for Trasys the usual profit levels it made from supplying other technical professionals. Trasys essentially agreed to the Suskovich arrangement as an accommodation to Wellpoint/Anthem in apparent appreciation for its having been selected by Wellpoint/Anthem to be a preferred vendor. Though the relationship between Suskovich and Trasys may at first glance suggest an employment context, the unique and extenuating circumstances relating to Suskovich undermine that theory.

The belief of the parties concerning the master/servant relationship is the ninth characteristic on the list of considerations. As indicated previously, we regard this as a particularly important factor in this case. The difference in gross pay between what Suskovich would have received  had he accepted Wellpoint/Anthem's offer of employment and what he actually received by invoicing his hours is quite substantial, and we have reason to believe that this

difference in earnings was also a matter of  particular importance to Suskovich.[4]  Based on the overwhelming evidence, we conclude that not only did Suskovich and Wellpoint/Anthem both believe that with regard to Suskovich they had established an independent contractor relationship between them, but that Suskovich specifically preferred it to be so, even though Wellpoint/Anthem eventually sought to rein in the expense associated with Suskovich's arrangement by offering him a position as an of employee.

As to the written agreement between Trasys and Suskovich and what it reveals in terms of the belief of the parties regarding their relationship, Trasys characterizes the contract as "badly drafted," a description we view as an understatement.  The title, "Independent Contractor Agreement,"  suggests a level of clarity in terms of the intent of the parties that is belied by the conflicting terms contained in the body of the agreement.  We are left, in the face of such confusion, with the impression that the text of the agreement was lifted from some other type of contract.  In choosing to rely on the title assigned to their agreement as an accurate description of the parties' belief regarding

---

[4]Had Suskovich chosen to accept the lower paying permanent employment offered by Wellpoint/Anthem, he might not have been able to withstand the expenses of maintaining  nine cars and three boats, as disclosed in the insurance records from close to the time of his death. We wonder as well, had he been an employee who had taxes withheld from his earnings by his employer, if he would have been able to afford the bowling alley that he had installed in one of his two homes.

their relationship, we rely on the substantial additional evidence, both within and outside the document.

In analyzing the indemnity provisions in the agreement, we discover that they are not at all consistent with an employer/employee relationship, particularly the provision making the "employment" subject to the final approval of Wellpoint/Anthem.  Further, we credit the evidence showing that the relationship between Trasys and Suskovich reflected the goal of  Suskovich and his friends and former colleagues at Wellpoint/Anthem to keep him involved in Wellpoint/Anthem projects following Wellpoint/Anthem's move to consolidate and reduce the number of third-party vendors, which would otherwise have foreclosed Suskovich's ability to directly contract with Wellpoint/Anthem.  Because the relationship between Suskovich and Wellpoint/Anthem as well as Trasys was not typical and because he was so much more highly compensated under the terms of his agreement than Wellpoint/Anthem associates or other professionals placed by Trasys, there was a perceived need to keep his compensation arrangements a secret from anyone other than the Wellpoint/Anthem and Trasys officials.  This likely explains the emphasis on confidentiality in the agreement, and is consistent with contractor relationships generally.

Patrick Foley, an official with Trasys, confirmed that Trasys believed the the relationship it had established with Suskovich was one of principal and

independent contractor.  Because Trasys's involvement was limited to
processing Suskovich's time sheets, collecting an administrative fee from
Wellpoint/Anthem and issuing a check, Trasys clearly did not perform the
usual, broad array of functions it would have had it been Suskovich's
employer.  Trasys also issued 1099s to Suskovich with which Suskovich never
took issue.  In addition, Suskovich worked for other businesses during this
time period and never included Trasys on his resume in any employment
capacity.  Accordingly, the overwhelming majority of the evidence supports the
fact that an independent contractor relationship had been created, despite the
inclusion of such terms as "employment" and "wages" in the "Independent
Contractor Agreement."

The final factor on the list of ten set forth in the Restatement (Second) is
the issue of whether the principal is or is not in business.  Frankly, though this
factor would have more relevance in a tort liability context, it holds little
significance in our determination of whether the protections of ERISA or the
FLSA apply to an individual performing work for a particular business entity.
This case does not involve an apportionment of liability between a principal
and his agent vis-a-vis a third party.  Here, there is not only no third party
issue to address, the future survival of Trasys or Wellpoint/Anthem will not
turn on a determination of whether Suskovich was working either as an

employee or an independent contractor.  Accordingly, this factor is of virtually no relevance to our ruling.

### *Conclusion*

Based on the overwhelming evidence made of record here, it is beyond serious dispute that Suskovich's work relationship with the Defendants was that of an independent contractor.  This is clearly what he and the Defendants had intended during all the years of its existence.  Apart from their intentions, the ten factor test set out in the Restatement (Second) of Agency § 220(b) (1958) leads as well to the firm conclusion that Suskovich was an independent contractor.  Accordingly, summary judgment must be entered in favor of all the Defendants.

Plaintiff's Motion For Partial Summary Judgment (Doc. #100) is DENIED. Defendant Trasys Inc.'s Motion For Summary Judgment (Doc. #102) is GRANTED and the Motion For Summary Judgment filed on behalf of all theWellpoint/Anthem Defendants (Doc. # 104) is also GRANTED.  A separate judgment shall issue.

IT IS SO ORDERED   12/10/2007

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Rachel Elizabeth Burke
PORTER WRIGHT MORRIS & ARTHUR LLP
rburke@porterwright.com

David Thomson Croall
PORTER WRIGHT MORRIS & ARTHUR LLP
dcroall@porterwright.com

Jane A. Dall
BAKER & DANIELS
jane.dall@bakerd.com

Michael A. Lang
DANN PECAR NEWMAN & KLEIMAN
mlang@dannpecar.com

Hannesson Ignatius Murphy
BARNES & THORNBURG LLP
hmurphy@btlaw.com

John W. Purcell
BAKER & DANIELS
john.purcell@bakerd.com

Mark Richard Waterfill
DANN PECAR NEWMAN & KLEIMAN
mwaterfill@dannpecar.com

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com

Kenneth J. Yerkes
BARNES & THORNBURG LLP
ken.yerkes@btlaw.com